**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

BENNETT COLLEGE,

     Plaintiff,

              v.

THE SOUTHERN ASSOCIATION OF
COLLEGES AND SCHOOLS COMMISSION
ON COLLEGES, INC.,

     Defendant.

Civil Action No.
1:19-cv-00883-SDG

## <u>OPINION AND ORDER</u>

This matter is before the Court on Plaintiff Bennett College's motion for partial summary judgment [ECF 62] and Defendant The Southern Association of Colleges and Schools Commission on Colleges, Inc.'s ("SACS") motion for summary judgment [ECF 78]. Having carefully reviewed the administrative record, and with the benefit of oral argument, Bennett's motion is **GRANTED** and SACS's motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND[1]

Unless otherwise noted, the following facts are not disputed by the parties or are supported by undisputed evidence in the record.[2] SACS is a private, nonprofit, and voluntary accrediting organization headquartered in Atlanta, Georgia.[3] SACS's membership is comprised of public and non-public higher education institutions in the United States and elsewhere.[4] As a whole, SACS accredits nearly 800 different higher education institutions.[5]

Founded in 1873, Bennett is a private, four-year, historically black, liberal arts college for women located in Greensboro, North Carolina.[6] Bennett is one of only two all-women Historically Black Colleges and Universities ("HBCU").[7] SACS's predecessor first accredited Bennett in 1935.[8] It has been continuously

---

[1]   For the purposes of this Order, the Court limits its review to only the evidence presented as part of the administrative record.

[2]   In this Order, the Court refers to some information that the parties filed under seal. The Court does not find that the cited information needs to be sealed, notwithstanding the parties' confidentiality designations.

[3]   ECF 91, ¶ 2.

[4]   *Id*.

[5]   *Id*. ¶ 3.

[6]   ECF 86, ¶ 1. ECF 91, ¶ 1.

[7]   ECF 86, ¶ 2.

[8]   ECF 91, ¶ 5.

accredited since that time.[9]

SACS's day-to-day operations are run by its internal staff of approximately 40 individuals.[10] It employs a multi-layered governance structure. For example, each of SACS's member institutions designates one voting member to SACS's College Delegate Assembly (the "Assembly").[11] The Assembly, in turn, elects 77 individual members to serve on SACS's Board of Trustees (the "Board").[12] The Board consists of representatives from 66 member institutions, as well as 11 public representatives who are not employed by a member institution—one from each U.S. State in which SACS represents an institution.[13] The Board maintains final responsibility in the accreditation process.[14] SACS's Executive Council (the "Council") is a subset of the Board and consists of the Board Chair, a public member, and a representative from each of the 11 U.S. States in which SACS

---

[9]   *Id.*

On February 22, 2019, the parties executed a consent agreement wherein the Court granted Bennett's motion for a preliminary injunction that permitted Bennett to retain its accreditation during the pendency of this litigation [ECF 5].

[10]   ECF 91, ¶ 6.

[11]   ECF 91, ¶ 7.

[12]   *Id.* ¶ 8.

[13]   *Id.* ¶ 9.

[14]   *Id.* ¶ 10.

represents an institution.[15] Among its other functions, the Council reviews and approves recommendations from SACS's Committees on Compliance and Reports (each a "C&R Committee") prior to their submission to the full Board.[16] The primary responsibility of a C&R Committee is to review and recommend action on the accreditation status of SACS's member institutions—which then must be approved by the Council and ultimately voted on by the Board.[17]

SACS bases its accreditation decisions on an institution's compliance with the requirements found in the *Principles of Accreditation: Foundations for Quality Enhancement* (the "*Principles*").[18] The Assembly adopted the current version of the *Principles* in December 2017, which became effective on January 1, 2018.[19] Relevant here, Core Requirement 13.1 ("CR 13.1") of the *Principles* requires an institution to have "sound financial resources and a demonstrated, stable financial base to support the mission of the institution and the scope of its programs and services."[20] To assess if an institution has a "sound financial base," SACS may

---

15   *Id*. ¶ 11.

16   *Id*. ¶ 12.

17   *Id*. ¶ 15.

18   *Id*. ¶ 36.

19   *Id*.

20   ECF 78-16, at 130.

consider, among other things, the institution's total new assets, unrestricted net assets (without donor restrictions), endowment balances, and "UNAEP" (unrestricted net assets exclusive of plant and plant-related debt).[21] In sum, the *Principles* make clear that "[t]here is no one way for an institution to present a case for sound and stable resource base, or for a peer evaluator to evaluate it."[22]

All institutions accredited by SACS are required to undergo a review for reaffirmation of their accreditation every ten years.[23] As part of that process, members must submit documentation showing that they have complied with the *Principles*.[24] SACS additionally requires its members to submit a Fifth-Year Interim Report as part of the reaffirmation process.[25] A member's Fifth-Year Report is due four years prior to the institution's next reaffirmation of accreditation review and must address certain selected standards articulated in the *Principles*.[26]

If the Board determines the institution is not in compliance with the *Principles* based on the Fifth-Year Interim Report, it may place the institution on

---

[21]   *Id.*

[22]   *Id.*

[23]   ECF 91, ¶ 17.

[24]   *Id.* ¶ 18.

[25]   *Id.* ¶ 20.

[26]   *Id.*

"Warning" and appoint a "Special Committee" to visit and evaluate the institution.[27] Once placed on Warning, an institution is required to submit a monitoring report after a designated period of time.[28] An institution may remain on Warning status for a maximum of two consecutive years, after which time it may be placed on "Probation," a more severe sanction.[29] Probation is generally, but not necessarily, invoked as a last step before an institution's accreditation is revoked.[30] An institution may be placed on Probation for a maximum of two consecutive years.[31] At all times, the institution bears the burden of providing evidence of its compliance with the *Principles*.[32]

An institution is entitled to appeal the Board's decision to revoke its accreditation to the "Appeals Committee."[33] The Appeals Committee consists of 12 individuals elected by the Assembly who have previously served on the

---

[27] *Id.*

[28] *Id.* ¶ 23.

[29] *Id.* ¶¶ 24–25.

[30] *Id.* ¶ 25.

[31] *Id.* ¶¶ 26–27.

[32] *Id.* ¶ 28.

[33] *Id.* ¶ 29.

Board.[34] An appeal may be decided by a quorum of 5 or more members of the Appeals Committee.[35] An institution may appeal the Board's accreditation decision for the following limited reasons: (1) "that the Board failed to follow its procedures and that its failure was significant in leading to the decision" or (2) "that the Board's decision was arbitrary, that is, was unreasonable and not based on, or consistent with, the published *Principles of Accreditation* or policies of the Commission."[36] While an institution generally may not submit new evidence on appeal, SACS's internal Appeals Procedures permit "an institution removed from accreditation based solely on finances" to submit "new and verifiable financial information that has become available since adverse action was taken and that is material to the reason for the [Board's] adverse decision."[37] Relevant here, SACS's internal Appeals Procedures state:

> The Appeals Committee shall remand the case either to the Committees on Compliance and Reports, the Executive Council, or the SACSCOC Board of Trustees . . . if the Appeals Committee finds that an institution, removed from accreditation based solely on finances, has produced evidence that it has available new

---

[34]   *Id*. ¶ 31.

[35]   *Id*. ¶ 32.

[36]   ECF 78-13.

[37]   *Id*.

7

and verifiable financial information and that the financial information is material to the Board's adverse decision.[38]

SACS most recently renewed Bennett's accreditation in 2009.[39] SACS reaffirmed Bennett's accreditation, but placed Bennett on Probation due to its financial issues.[40] SACS subsequently removed Bennett from Probation in December 2011, but requested that Bennett continue to comply with Comprehensive Standard ("CS") 3.10.1 (Financial Stability) in its Fifth-Year interim Report, due in 2014.[41]

In 2014, SACS reviewed Bennett's Fifth-Year Interim Report and found deficiencies in Bennett's compliance with CS 3.10.1.[42] SACS requested that Bennett submit a First Monitoring Report by September 8, 2015 to address SACS's concerns

---

[38]   ECF 62-13, at 13.

[39]   ECF 86, ¶ 7. ECF 91, ¶ 45.

[40]   ECF 91, ¶ 45.

[41]   *Id.* ¶ 46.

Prior to its 2018 edition, certain standards in the *Principles* were organized in sections relating to "Core Requirements," "Comprehensive Standards," and "Federal Requirements." [*Id.* ¶ 39.] In the 2018 edition, "Core Requirements" remain, but the distinction between "Comprehensive Standards" and "Federal Requirements" was discarded. [*Id.*] Thus, while labeled differently, CR 3.10 and CS 3.10.1 are substantively identical. Accordingly, this Order refers to the standard as CS 3.10.1.

[42]   *Id.* ¶ 47.

with Bennett's financial stability.[43] Specifically, SACS noted that Bennett "continues to experience reductions in total net assets" and its "[o]perating deficits in three of the last four years (per the auditor), dependence on endowment funding for operations, and a decline in student enrollment indicate a concern of financial stability."[44] SACS warned that it could issue sanctions in the form of Probation or loss of accreditation if Bennett did not comply with the *Principles*.[45]

Following its review of Bennett's First Monitoring Report, SACS determined that Bennett was still failing to comply with CS 3.10.1 and placed it on Warning status for twelve months.[46] SACS noted that the "continuing decline in enrollment and declining tuition revenue raises concerns regarding the financial stability of the College" and the "operating losses of FY 2015 do not support an argument that the College has a history of financial stability."[47] SACS requested that Bennett submit a Second Monitoring Report by September 6, 2016.[48]

---

[43]   ECF 91, ¶ 47; ECF 78-19, at 8.

[44]   ECF 78-19, at 8.

[45]   *Id*.

[46]   ECF 91, ¶ 48.

[47]   ECF 78-19, at 11.

[48]   *Id*.

Following its review of Bennett's Second Monitoring Report, SACS determined that Bennett had failed to comply with CR 2.2 (Governing Board), CR 2.11.1 (Financial Resources and Stability), and CS 3.10.1 of the *Principles*; it placed Bennett on Probation for 12 months.[49] SACS's decision again highlighted the perceived deficiencies in Bennett's financial position in relation to the *Principles*; SACS commissioned a First Special Committee to visit and audit Bennett, and requested that Bennett file a Third Monitoring Report on September 8, 2017.[50]

Following its review of Bennett's Third Monitoring Report, SACS determined that Bennett had again failed to comply with CR 2.11.1 and CS 3.10.1 and decided to keep Bennett on Probation for another 12 months.[51] SACS commissioned a Second Special Committee to visit Bennett and directed Bennett to submit a Fourth Monitoring Report.[52] SACS informed Bennett that, with the upcoming review, Bennett "will have exhausted its probationary status and its period of continued accreditation for Good Cause. At that time, [Bennett] must

---

[49]   ECF 91, ¶ 49; ECF 78-19, at 13.

[50]   ECF 78-19, at 13.

[51]   ECF 91, ¶ 50; ECF 78-19, at 17.

[52]   ECF 78-19, at 17.

demonstrate compliance with all the requirements and standards of the [*Principles*] or be removed from membership."[53]

Bennett submitted its Fourth Monitoring Report on September 6, 2018.[54] The C&R Committee reviewed Bennett's Fourth Monitoring Report, the report compiled by the Second Special Committee, and other relevant documents; it ultimately recommended that Bennett's accreditation be removed for failure to comply with CR 13.1.[55] Specifically, the C&R Committee found that Bennett did not "have sound financial resources and a demonstrated, stable financial base to support the mission of the institution and the scope of its programs and services."[56] On December 9, 2018, the Board approved the recommendation of the C&R Committee and removed Bennett's accreditation.[57]

Following the Board's decision, Bennett initiated a grassroots fundraising campaign—colloquially known as #StandWithBennett—in an effort to address its financial issues.[58] While the parties dispute the precise dollar amount raised,

---

[53]   *Id.* at 19.

[54]   ECF 91, ¶ 51.

[55]   *Id.* ¶ 52; ECF 78-19, at 20.

[56]   ECF 78-19, at 28.

[57]   *Id.*; ECF 86, ¶¶ 21–22.

[58]   ECF 86, ¶ 26.

neither genuinely challenges the campaign's overall success. Between July 1, 2018 and February 14, 2019, Bennett raised over $6 million in restricted and unrestricted funds from contributions.[59] Additionally, one of Bennett's creditors agreed to forgive a loan of over $1 million.[60] Bennett's independent auditor sample-tested 56% of these fundraising amounts and found them to be accurate.[61]

On January 23, 2019, Bennett timely appealed the Board's decision to revoke its accreditation.[62] On January 31, 2019, SACS's Appeals Committee, through its hearing officer, sent Bennett a letter explaining the appeals process.[63] In accordance with SACS's internal Appeals Procedures, this letter stated:

> The Decision of the [Board] will be reviewed exclusively upon the conditions existing at the time of that decision . . . except in the case of an institution removed from accreditation solely on finances that has **new and verifiable information** that is material to the Board's adverse decision. In such a case, the institution's **new and verifiable financial information must be disclosed as part of the institution's brief** so as to give the Appeals Committee and [SACS] ample time to review and

---

[59]   ECF 62-16 (SEALED).

[60]   *Id*.

[61]   *Id.*; ECF 86, ¶¶ 44–45.

[62]   ECF 91, ¶ 69.

[63]   *Id.* ¶¶ 72–73; ECF 78-40.

> analyze the documents. The policy is specific that the
> financial information be new and verifiable.[64]

In its appeal, Bennett argued the Appeals Committee should reverse the Board's

adverse decision because Bennett had submitted "new and verifiable financial

information, material to the adverse decision regarding the financial resources of

Bennett."[65] This information included the fruits of Bennett's #StandWithBennett

fundraising campaign.[66]

On February 18, 2019, the Appeals Committee affirmed the Board's decision

to revoke Bennett's accreditation and declined to remand the matter.[67] The

Appeals Committee stated that it examined the additional financial information

submitted by Bennett, but found that Bennett had "failed to show that the

institution possesses resources demonstrating a stable financial base to support

the mission and scope of programs and services."[68] Therefore, the Appeals

---

[64]   ECF 78-40 (emphasis in original).

[65]   ECF 86, ¶ 42.

[66]   ECF 62-16; ECF 62-15; ECF 86, ¶¶ 43–47.

[67]   ECF 91, ¶ 89.

[68]   ECF 62-19.

Committee affirmed the Board's action without a remand for consideration of Bennett's new, additional financial information.[69]

Bennett initiated this district court action against SACS on February 22, 2019 and filed its Amended Complaint on April 26, 2019.[70] It asserts three claims against SACS: Count I alleges SACS violated Bennett's due process rights by failing to follow its own rules and procedures when it decided to remove Bennett's accreditation; Count II asserts SACS failed to afford Bennett adequate due process in reaching its accreditation decision; and Count III asserts SACS's decision was arbitrary, unreasonable, and not supported by the record.[71]

On February 7, 2020, Bennett filed a motion for partial summary judgment on its claim that SACS violated its common law due process rights, which permeates all three counts of the Amended Complaint.[72] On the same day, SACS filed its motion for summary judgment on all of Bennett's claims.[73] On March 9, 2020, SACS filed a response in opposition to Bennett's motion and Bennett filed a

---

[69]   *Id.*

[70]   ECF 1; ECF 10.

[71]   *See generally id.*

[72]   ECF 62, at 2.

[73]   ECF 78.

response in opposition to SACS's motion.[74] Both parties filed replies on March 23, 2020.[75] On June 9, the Court held oral argument on the cross-motions.

## II.   LEGAL STANDARD ON SUMMARY JUDGMENT

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary" are not material. *Id*. A factual dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324. The non-movant "may not rest upon the mere allegations or denials of his

---

74   ECF 85; ECF 86.

75   ECF 96; ECF 97.

pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. If the evidence relied on by the non-movant is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249.

In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that party. *Anderson*, 477 U.S. at 255. *See also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" and cannot be made by the district court. *Anderson*, 477 U.S. at 255. *See also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Summary judgment for the moving party is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). *See also Anderson*, 477 U.S. at 250 ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial— whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.").

16

III.   **DISCUSSION**

a.   **Bennett's Common Law Due Process Claims**

Bennett asserts three separate counts in its Amended Complaint, but each claim is based on the same fundamental allegation: that SACS violated Bennett's common law due process rights by revoking Bennett's accreditation.

i.   **Legal Standard**

As a threshold matter, there is a question as to whether Bennett can pursue a claim based on a violation of common law due process. The only two Eleventh Circuit cases reaching the issue have expressly declined to decide whether such a claim may be pursued. *Paine Coll. v. S. Ass'n of Colleges & Schs. Comm'n on Colleges, Inc.*, 810 F. App'x 852, 856–57 (11th Cir. 2020); *Hiwassee Coll., Inc. v. S. Ass'n of Colleges & Schs.*, 531 F.3d 1333, 1335 (11th Cir. 2008). To the extent such a claim exists, the Eleventh Circuit has relied on the standard articulated by the Sixth Circuit in *Thomas M. Cooley Law Sch. v. Am. Bar Ass'n*, 459 F.3d 705 (6th Cir. 2006). *See also Fla. Coastal Sch. of Law, Inc. v. Am. Bar Ass'n*, No. 3:18-cv-621-J-39JBT, 2018 WL 9392564, at *4 (M.D. Fla. July 9, 2018) (citing *Hiwassee*, 531 F.3d at 1335 n.4) ("The Eleventh Circuit has not decided whether accrediting agencies have a common law duty to comport with the strictures of due process, but to the extent that they must, the court adopted the standard of review delineated in *Cooley*, and

reviewed only whether the decision of an accrediting agency . . . was arbitrary and unreasonable or an abuse of discretion and whether the decision was based on substantial evidence.") (internal punctuation omitted). In the absence of a clear directive from the Eleventh Circuit, the Court will analyze Bennett's due process claims under the standard articulated in *Cooley. See Paine*, 810 F. App'x at 856–57.

In *Cooley*, the Sixth Circuit recognized that "quasi-public professional organizations and accrediting agencies," such as SACS, "have a common law duty to employ fair procedures when making decisions affecting their members." 459 F.3d at 711. This judicial construct materialized as "a check on organizations that exercise significant authority in areas of public concern such as accreditation and professional licensing." *Id*. The district court in *Paine* succinctly summarized the interplay between the federal government and accrediting bodies such as SACS, as well as the court's role in reviewing such bodies' decisions:

> The federal government does not itself directly accredit institutions of higher education. Instead, the Secretary of Education approves accrediting organizations, and these bodies set their own standards for accreditation. Accrediting agencies such as the Southern Association act on behalf of the Secretary of Education and wield the quasi-governmental power of deciding which institutions are eligible for federal funds. Thus, courts review the decisions of these accrediting organizations for violations of fundamental due process rights.

*Paine Coll. v. S. Ass'n of Colleges & Schs. Comm'n on Colleges, Inc.*, 342 F. Supp. 3d 1321, 1334 (N.D. Ga. 2018). *See also Auburn Univ. v. S. Ass'n of Colleges & Schs., Inc.*, 489 F. Supp. 2d 1362, 1371 (N.D. Ga. 2002) ("An accrediting agency is a proxy for the federal department whose spigot it opens and closes.").

While the Court must ensure that SACS has complied with the requirements of due process, the scope of review is limited. The Court must apply a "deferential standard" and "review only whether the decision of an accrediting agency . . . is arbitrary and unreasonable or an abuse of discretion and whether the decision is based on substantial evidence." *Paine*, 810 F. App'x at 857 (citing *Hiwassee*, 531 F.3d at 1335 n.4; *Cooley*, 459 F.3d at 712). A substantial amount of deference is important in this area due to "the professional judgment these associations must necessarily employ in making accreditation decisions." *Wilfred Acad. of Hair & Beauty Culture, Houston, Tex. v. S. Ass'n of Colleges & Schs.*, 957 F.2d 210, 214 (5th Cir. 1992). The level of institutional expertise required means that "the standards of accreditation are not guides for the layman but for professionals in the field of education." *Id*. Put another way, the Court is limited to examining "whether the *process* was arbitrary and unreasonable or an abuse of discretion and whether the *decision* was made with sufficient reasoning." *Paine*, 810 F. App'x at 857 (emphasis in original).

The Court is also cognizant of the gravity of its decision. As noted by the Court in the *Hiwassee* and *Paine* cases, the decision to affirm the revocation of a member's accreditation may well signal the death knell for that institution. Bennett is an HBCU that has provided a vital service for nearly 150 years. This matter has far-reaching implications on both current students and alumnae. As noted in *Paine*:

> [SACS's] decision to remove Paine from membership puts it in a critical position and most likely would signal its demise in that at the very least federal financial aid is unavailable to unaccredited schools. An institution denied accreditation is likely to promptly go out of business—as very few people are willing or able to pay tuition out of their own pockets.

342 F. Supp. 3d at 1335. *See also* Paine, 810 F. App'x at 854 ("Accreditation by a recognized accrediting agency, such as SACS, is a prerequisite for an institution's students to receive federal financial assistance."); *Hiwassee Coll., Inc. v. S. Ass'n of Colleges & Schs.*, Civ. A. No. 1:05-cv-0951-JOF, 2007 WL 433098, at *5 (N.D. Ga. Feb. 5, 2007).

At bottom, however, the Court is "not free to conduct a *de novo* review or to substitute [its] judgment for the professional judgment of the educators involved in the accreditation process." *Wilfred*, 957 F.2d at 214. The Court is limited solely to the parameters of due process: "[W]hether the accrediting body's internal rules

provide a fair and impartial procedure and whether it has followed its rules in reaching its decision." *Id.*

### ii.   Whether SACS's Decision Was Arbitrary or an Abuse of Discretion

Bennett argues SACS violated its due process rights by failing to follow SACS's own internal Appeals Procedures, which Bennett contends required the Appeals Committee to remand the case to the Board after Bennett submitted new, verifiable, and material information regarding its improved financial position.

The fundamental components of due process are "notice and an opportunity to respond." *Auburn*, 489 F. Supp. 2d at 1373–74. At a minimum, an "open, fair and deliberative process" is required to "protect all interests and to assure some measure of confidence in the outcome of the inquiry." *Id.* A critical inquiry in the due process analysis is whether the accrediting agency complied with its own internal rules. It is axiomatic that an accrediting agency's failure to follow its own rules constitutes a violation of due process. *E.g.*, *Paine*, 342 F. Supp. 3d at 1334–35 ("[T]he failure of an accrediting agency such as the Southern Association to follow its own rules . . . would deny an institution due process."); *Hiwassee*, 2007 WL 433098, at *4 ("[F]ailure of SACS to follow its own rules would deny the institution due process."); *Auburn*, 489 F. Supp. 2d at 1375 ("It now seems to the court that the use of that Committee would violate SACS's own rules and, therefore, deny due

process to Auburn."). *See also Prof'l Massage Training Ctr., Inc. v. Accreditation All. of Career Schs. & Colleges*, 781 F.3d 161, 172 (4th Cir. 2015) ("When adjudicating common law due process claims against accreditation agencies, courts should focus primarily on whether the accrediting body's internal rules provided a fair and impartial procedure and whether it followed its rules in reaching its decision."); *Wilfred*, 957 F.2d at 214 ("[C]ourts focus primarily on whether the accrediting body's internal rules provide a fair and impartial procedure and whether it has followed its rules in reaching its decision.").

It is undisputed that SACS removed Bennett's accreditation solely because of Bennett's financial position and failure to comply with CR 13.1.[76] SACS's internal Appeals Procedures permitted Bennett to appeal that decision and submit "new and verifiable financial information that has become available since [the] adverse action was taken and that is material to the reason for the [Board's] adverse decision."[77] On appeal, Bennett submitted supplemental financial information to the Appeals Committee demonstrating that, since the Board's adverse action, it had raised over $6 million in restricted and unrestricted funds

---

[76]   ECF 62-14, at 2.

[77]   ECF 78-13.

and its creditor had agreed to forgive a loan totaling over $1 million.[78] The Appeals Committee considered this supplemental information in its review of the Board's decision.

SACS's Appeals Procedures expressly provide that the Appeals Committee "***shall remand*** the case" if an institution removed from accreditation solely because of finances—such as Bennett—produces "evidence that it has available new and verifiable financial information and that the financial information is material to the Board's adverse decision."[79] Thus, irrespective of the process afforded to Bennett resulting in the underlying Board decision to revoke accreditation, if Bennett's supplemental financial information qualified as (1) new, (2) verifiable, and (3) material, the Appeals Procedures *required* the Appeals Committee to remand the case so that the Board could consider the information.

### 1.    Bennett Submitted "New" Information.

The parties do not dispute that Bennett's supplemental financial evidence constitutes new information. SACS defines "new" information as "evidence made available since the time of the Board's adverse action."[80] The Board voted to revoke

---

[78]    ECF 62-15 (SEALED).

[79]    ECF 62-13, at 13 (emphasis added).

[80]    ECF 89, at 34.

Bennett's accreditation on December 9, 2018.[81] It is undisputed that, in making the adverse decision, the Board did not consider the schedule of fundraising activities or creditor letter, which were compiled from July 1, 2018 through February 14, 2019. This information only became available to Bennett after the Board's adverse decision. In its brief to the Appeals Committee, SACS conceded that Bennett's supplemental financial evidence constituted "new" information that was not available to the Board when it rendered its decision.[82]

Therefore, the Court finds Bennett's supplemental financial information qualified as "new" in compliance with SACS's Appeals Procedures.

## 2.     Bennett Submitted "Verifiable" Information.

SACS's Appeals Procedures do not define the term "verifiable."[83] SACS contends that it has consistently interpreted "verifiable" to require audited financial statements—*i.e.*, SACS requires that the information be "verified" at the time it is submitted. SACS points to the district court's decision in *Paine*, which found SACS's interpretation of "verifiable" as meaning verified at the time it is submitted to be "reasonable and entitled to deference." 342 F. Supp. 3d at 1351.

---

[81]   ECF 62-14.

[82]   ECF 62-18, at 27–30.

[83]   ECF 86, ¶ 35.

24

Bennett's supplemental financial information included: (1) updated financial statements, (2) a schedule of fundraising activities showing over $6 million in available funds raised, and (3) a letter from Bennett's lender forgiving an over $1 million loan. While the updated financial statements were unaudited, the schedule of fundraising activities and creditor letter were test-sampled by Bennett's independent auditor.[84] The independent auditor tested and confirmed 56% of the restricted and unrestricted funds, as well as the entirety of the creditor letter.[85] As such, using SACS's own definition, Bennett's schedule of fundraising activities and creditor letter constituted "verifiable" information. In fact, SACS conceded this information was "verifiable" in its brief to the Appeals Committee:

> Only two of the attachments to the College Brief meet the requirements of "new" and "verifiable" information. These are Exhibit B: Schedule of Fundraising Activities, confirming total gifts and contributions raised through February 3, 2019, to be $6,140,849; and, Exhibit D: Lender's Letter, confirming forgiveness of . . . interest. These unrestricted gifts would apply towards the College's unrestricted net asserts . . . [and] are critical for the institution.[86]

---

[84]   ECF 62-16.

[85]   *Id*.

[86]   ECF 62-18, at 28.

Therefore, the Court finds that the schedule of fundraising activities and creditor letter constituted "verifiable" information in compliance with SACS's Appeals Procedures.

### 3. The Appeals Committee Did Not Apply the Correct Standard for Determining Materiality.

Like the term "verifiable," SACS's Appeals Procedures do not define the term "material."[87] In its brief to the Appeals Committee, SACS defined "material" as follows:

> In order to be "material" to the Board's adverse decision, [SACS] requires the new and verifiable information to be capable of changing the decision against the institution. It is not for the Appeals Panel to determine that the new and verifiable information in fact **should** change that decision, but rather it is for the Appeals Panel to determine, if considered by reasonable professionals, that information has the potential to result in a different outcome. If the information meets this standard, it is "material" to the Board's adverse action.[88]

Bennett does not challenge SACS's definition of "material." Rather, Bennett contends the Appeals Committee violated its own internal Appeals Procedures—and thereby Bennett's common law due process rights—by going beyond this materiality determination and answering the ultimate question itself: whether

---

87   ECF 86, ¶ 38.

88   ECF 62-18, at 29 (emphasis in original).

Bennett's supplemental evidence in fact changed the Board's adverse decision. Put another way, Bennett argues the Appeals Committee did not decide if Bennett's supplemental financial information *had the potential* to change the Board's decision; instead, the Appeals Committee improperly decided, as a matter of fact, that the information *did not* change the revocation determination. Therefore, according to Bennett, the Appeals Committee essentially usurped the role of the Board and violated its own procedures in the process.

Based on the record, the Court agrees. In its February 18, 2019 letter informing Bennett of the Appeals Committee's decision, SACS stated:

> The Appeals Committee finds that Bennett College, removed from accreditation based solely on finances, failed to produce new and verifiable evidence since December 9, 2018, that is material to the Board's adverse decision. More specifically, *it failed to show that the institution possesses resources demonstrating a stable financial base to support the mission and scope of programs and services*.[89]

A plain reading of the decision letter compels the conclusion that the Appeals Committee applied the wrong standard for determining materiality. Under its own rules, it was not the role of the Appeals Committee to determine whether Bennett "possesses resources demonstrating a stable financial base to support the

---

[89]   ECF 62-19 (emphasis added).

27

mission and scope of programs and services."[90] Rather, the Appeals Committee should have limited its decision to whether the new and verifiable information had the *potential* to change the Board's decision and *potentially* result in a different accreditation outcome.

The Court has carefully reviewed the administrative record and concludes that the Appeals Committee applied the wrong standard for determining materiality, and thereby failed to follow SACS's own rules. The Appeals Committee usurped the role of the Board and determined that Bennett's supplemental information did not ultimately bring Bennett into financial compliance. Since the Appeals Committee violated SACS's own rules, it thereby violated Bennett's due process rights.

The Court notes that the Eleventh Circuit's decision in *Paine* does not compel a different result. There, the Eleventh Circuit stated that "minor departures from an outlined procedure do not *per se* cause injury and therefore [do] not amount to a violation of procedural due process." *Paine*, 810 F. App'x at 859. In *Paine*, the plaintiff argued SACS violated its due process rights by not complying with the Appeals Procedures in the selection of the Appeals Committee. *Id.*

---

[90]   *Id.*

Specifically, the plaintiff argued SACS erred by (1) allowing a member who had an arguable conflict of interest to serve on the Appeals Committee, and (2) appointing two unelected members to serve on the Appeals Committee before all elected members had been contacted to determine if a quorum existed. *Id.* While these were violations of the Appeals Procedures, the Eleventh Circuit held:

> Given the lengthy process the Committee utilized before the appeal even happened and given that Paine has not produced any evidence to suggest these errors had an effect on the ultimate decision, Paine has not demonstrated that it was denied due process.

*Id.*

In contrast to *Paine*, the Appeals Committee's decision here is not a mere "minor departure" from SACS's rules. The Appeals Committee denied Bennett an opportunity to present to the Board new, verifiable, and potentially outcome-changing information that may have changed its accreditation decision. Unlike *Paine*, the Board here may have reversed its decision had the Appeals Committee followed SACS's rules. This deprived Bennett of due process. Therefore, the Eleventh Circuit's *Paine* decision does not foreclose the Court's finding here.

The Court is mindful of its limited role in this arena. *Paine*, 810 F. App'x at 857 ("[T]he real question, under this standard of review, is whether the process and decision were fundamentally fair."). This includes the deference the Court

must afford decisions rendered by the Board and Appeals Committee. It is not the province of this Court to make its own finding as to whether Bennett's supplemental evidence constitutes "material" information. *Wilfred*, 957 F.2d at 214. That decision lies with the Appeals Committee. The Appeals Committee must answer the limited question of whether the information presented by Bennett has the potential to result in a different outcome. And, if it does, the Appeals Committee, under SACS's own rules, *must* remand Bennett's case to the Board.

Therefore, the Court finds this case must be remanded back to the Appeals Committee for a materiality determination. The Court makes no finding as to whether Bennett's supplemental evidence constitutes "material" information. Bennett's partial motion for summary judgment on its claims for common law due process is **GRANTED**. SACS's motion for summary judgment on these claims is **DENIED**.

### b.    Bennett's Claims for Racial Discrimination

In the Amended Complaint, Bennett alleges that SACS applies policies and procedures that disparately impact HBCUs.[91] According to Bennett, SACS's "reliance on policies and procedures that do not take into account the unique

---

[91]    ECF 10, ¶ 67.

circumstances of HBCUs—a history of separate but unequal public funding and systemic discrimination—had an adverse impact on HBCUs and denies them a fair and due process."[92] Bennett points to evidence, in the form of an online blog post, which states that HBCUs only make up 13% of SACS's membership, but constitute 25% of SACS's sanctions.[93]

In its motion for summary judgment, SACS disputes Bennett's characterizations. SACS presents evidence that its member institutions—both HBCUs and non-HBCUs—approved a common set of standards in 2017 to which each institution agreed to abide.[94] According to SACS, it applies these standards equally among all its member institutions. SACS additionally argues that Bennett has failed to support its claim of disparate treatment with any evidence. Bennett, conversely, argues a genuine issue of material fact exists as to whether SACS applies its policies and procedures in a disparate and disproportional manner to HBCUs.

---

[92] *Id*. ¶ 68.

[93] Historically Black Colleges and Universities (HBCUs): A Background Primer, NEW AMERICA (Jan. 1, 2015) https://www.newamerica.org/post-secondary-national-policy-institute/our-blog/historically-black-colleges-and-universities-hbcus/ (last visited July 21, 2020).

[94] ECF 78-5.

Based on the record, the Court finds that Bennett has failed to carry its burden in opposing summary judgment. The evidence demonstrates that SACS holds both HBCUs and non-HBCUs to the same standards.[95] And, while the evidence indicates that HBCUs regularly face unique and significant challenges regarding the access to resources,[96] Bennett does not point to any evidence demonstrating how SACS's practices and policies have a disparate impact on HBCUs. More specifically, Bennett does not tie its allegations of a disparate impact to SACS's decision to revoke Bennett's accreditation. In sum, Bennett cannot rely on unsupported inferences from a single online source to create a genuine issue of material fact sufficient to overcome summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."); *Anderson*, 477 U.S. at 247–48 ("[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.");

---

[95]  ECF 71 (Thompson-Sellers Dep. Tr. 35:16–36-5); ECF 90, at 27–28.

[96]  ECF 90-10 (Earvin Dep. Tr. 21:4–6).

*Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.").

Therefore, SACS's motion for summary judgment is **GRANTED** as to Bennett's claims for racial discrimination.

## IV. CONCLUSION

Bennett's motion for partial summary judgment [ECF 62] is **GRANTED** and SACS's motion for summary judgment [ECF 78] is **GRANTED IN PART and DENIED IN PART**. The Clerk is **DIRECTED** to enter judgment in favor of Bennett on its common law due process claims and in favor of SACS on Bennett's claims for disparate treatment based on race. The Clerk is subsequently **DIRECTED** to close the case. Each party shall bear its own costs.

**SO ORDERED** this the 23rd day of July 2020.

Steven D. Grimberg
United States District Court Judge